**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 17-109-DLB-CJS**

**MEGACORP LOGISTICS, LLC**                                **PLAINTIFF**

**V.**                     **MEMORANDUM OPINION AND ORDER**

**TURVO, INC., et al.**                                  **DEFENDANTS**

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the court on Defendants Turvo, Inc. and Pacific Sky Group, LLC's Motion to Transfer Venue pursuant to 28 U.S.C. § 1404(a). (Doc. # 20). Plaintiff MegaCorp Logistics, LLC having responded (Doc. # 26), and Defendants having replied (Doc. # 27), the Motion is ripe for review. For the reasons stated below, Defendants' Motion to Transfer is **granted**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

According to its Amended Complaint, Plaintiff MegaCorp Logistics, LLC ("MegaCorp") provides "freight brokerage services throughout the United States." (Doc. # 7 at 2). Defendant Turvo, Inc. ("Turvo") "operates a collaborative logistics software platform" related to freight brokerage, and Defendant Pacific Sky, LLC ("Pacific Sky") is a "software development company that was and is affiliated with Turvo." *Id.* In early 2013, MegaCorp's Vice President of Sales started a dialogue with Pacific Sky's owner, leading to the concept behind Turvo's software, which is designed to "enable [freight] brokers to operate more efficiently." *Id.* at 7. About a year and a half later, the higher-ups at MegaCorp were brought into the discussion, and a Mutual Nondisclosure Agreement

("NDA") was signed by the parties. *Id.*

The NDA is for a term of two years, with the nondisclosure obligations extending to five years. (Doc. # 7-1). This agreement prohibits either party from disclosing "Confidential Information" or reproducing "Confidential Information" without permission. *Id.* In addition, the NDA limits the use of "Confidential Information to "evaluating or pursuing a business relationship between the parties," while expressly denying the recipients any rights to the "Confidential Information." *Id.* The NDA defines "Confidential Information" as: (1) "designated in writing to be confidential or proprietary, or if disclosed orally, is confirmed in writing as having been disclosed as confidential within a reasonable time"; and (2) "information that would reasonably appear to be confidential or proprietary under the circumstances." *Id.* The NDA also contains a merger clause:

> This Agreement may not be amended except by a writing signed by both parties. Failure to enforce any provision of this Agreement by a party shall not constitute a waiver of any term hereof by such party. This Agreement sets forth the entire agreement between the parties with respect to the Confidential Information disclosed and supersedes all prior or contemporaneous, oral, or written agreements concerning such Confidential Information.

*Id.*

Soon after executing the NDA, the parties further codified their relationship through a Consulting Services Agreement ("CSA"), which became effective on September 25, 2014. (Doc. # 7 at 10). Under this agreement, Pacific Sky agreed to perform certain services as a consultant to MegaCorp. (Doc. # 7-2). The CSA also contains limitations on the disclosure of "Confidential Information." *Id.* at 4. Under the CSA, "Confidential Information" is defined as: "(a) relate[d] to the disclosing party's past, present and future research, development, business activities, products, software, services, and technical

knowledge, provided such information has been identified as confidential or would be understood to be confidential by a reasonable person under the circumstances"; "(b) Proprietary Materials"; and "(c) Consultant Property." *Id.*

"Proprietary Materials" is broadly defined in the CSA:

> All materials (whether written, printed, graphic, or electronically recorded) that are furnished by MegaCorp (including by its clients, partners, employees, contractors, or representatives) to Consultant in connection with Consultant's performance of the Services are "Proprietary Materials" and shall remain the property of MegaCorp. Proprietary Materials include, but is not limited to, MegaCorp client information, product information, business plans, marketing plans, pricing information, personnel information, engineering designs, research, software, all code related to the MegaCorp "Transportation Management System", inventions, processes, finances or any other financial or accounting information.

*Id.* at 3.

The CSA contains other provisions codifying the relationship between MegaCorp and Pacific Sky. In particular, the CSA contains a choice-of-law provision, as well as a forum-selection clause. As to choice of law, the parties agreed that: "[The CSA] shall be interpreted and enforced in accordance with the laws of California without regard to the conflict of laws provisions thereof." *Id.* at 10. For choice of forum, the CSA provides as follows:

> The parties agree to the exclusive jurisdiction of the state and federal courts located in, or having jurisdiction over, Santa Clara County, California.

*Id.*

The CSA also contains two merger clauses:

> The terms and conditions of this Agreement contain the entire understanding and agreement of the parties regarding the subject matter hereof. This Agreement supersedes all existing agreements, including all oral or written proposals, all negotiations, conversations, or discussions between the parties relating to this Agreement, and past course of dealing or industry custom.

*Id.* at 8; and

> This Agreement and its Appendices, Exhibits and SOWs constitute the entire agreement between Consultant and Client with respect to the subject matter hereof and supersede, and are not entered into in reliance on, any and all prior agreements, statements, promises, understandings, and negotiations, whether written or oral, regarding the subject matter hereof, and any terms and conditions included on client's purchase orders, whenever delivered. This Agreement and any SOW cannot be amended unless in writing and signed by duly authorized representatives of each party and in no event shall any terms or conditions included on client's purchase orders issued after the date of this Agreement have any force or effect between the parties.

*Id.* at 9.

Both the NDA and the CSA contain prohibitions against disclosing confidential or proprietary information to any third parties, except as permitted under the contracts. (Docs. # 7-1 and 7-2 at 4-5).

On October 8, 2014, MegaCorp and Pacific Sky entered into a third agreement: the Letter of Understanding ("LOU"). (Doc. # 7 at 12). The LOU focuses on the "Transportation Management System Software" ("TMS"):

> Both parties agree that all code and documentation regarding MegaCorp's "Transportation Management System Software" utilized in discovery and analyses for the purpose of finalizing the "Consulting Services Agreement" between the two parties may not be reused or sold without the written permission of MegaCorp. All code that is part of the "Transportation Management System Software" specified in the scope of work provided to Pacific Sky as part of the "Consulting Services Agreement" and code modified or developed as part of the deliverables in the scope of work for the "Transportation Management System Software" may not be reused or sold without the written permission of MegaCorp.

(Doc. # 7-3).

While the relationship between MegaCorp and Pacific Sky was being memorialized, the owner of Pacific Sky incorporated Turvo, Inc. (Doc. # 7 at 12). Soon

after, MegaCorp's Vice President of Sales left to become Turvo's Chief Operations Officer, and for several months served both companies. *Id.* at 13. The relationship among the parties was maintained through the summer of 2015, until, according to Plaintiff, "Turvo and Pacific Sky's inability to produce a working model of its software became a growing concern for MegaCorp" and "MegaCorp elected to withdraw from the business relationship." *Id.* at 19.

Almost two years later, MegaCorp filed suit against Pacific Sky and Turvo, alleging that Turvo "continued to use MegaCorp's confidential and proprietary information" after MegaCorp withdrew from the relationship; that Turvo's software "contains MegaCorp's confidential and proprietary information"; that "Turvo software incorporates proprietary aspects of MegaCorp's Source Code"; and that Turvo is placing MegaCorp's confidential and propriety information into the hands of MegaCorp's competitors. *Id.* at 20. In addition, MegaCorp claims that Defendants' "employees were surreptitiously accessing" its system "to gain access to all the information they could." *Id.* at 16.

MegaCorp alleges six claims for relief: (1) breach of the NDA; (2) breach of the LOU; (3) misappropriation of trade secrets under Kentucky law; (4) tortious interference with a business relationship; (5) unjust enrichment; and (6) negligent misrepresentation. *Id.* at 21-25. Notably, MegaCorp has not alleged breach of the CSA. *See id.*

In response to the Amended Complaint, Defendants Turvo and Pacific Sky filed the instant Motion to Transfer Venue, requesting that the Court transfer this action to the Northern District of California.[1] (Doc. # 20).

---

[1] The Court takes judicial notice that Santa Clara County, California falls within the jurisdiction of the United States District Court for the Northern District of California.

## II.    ANALYSIS

Plaintiff has pled two breach-of-contract claims—one alleging breach of the NDA and one alleging breach of the LOU—in addition to claims for intentional interference of a business relationship, violation of the Kentucky Uniform Trade Secrets Act, negligent misrepresentation, and unjust enrichment.  (Doc. # 7 at 21-26).  Neither the NDA nor the LOU contain forum-selection clauses.  (Docs. # 7-1 and 7-3).  Despite the absence of a claim for breach of the CSA, Defendants have moved this Court to transfer the action to the Northern District of California, based upon the forum-selection clause in the CSA. (Doc. # 20).

Defendants' motion to transfer pursuant to the forum-selection clause in the CSA is appropriately viewed as a motion to transfer venue under 28 U.S.C. § 1404(a).  *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 134 S. Ct. 568, 575 (2013). Normally, a court considering a § 1404(a) motion would "weigh the relevant factors and decide whether, on balance, a transfer would serve the 'convenience of parties and witnesses' and otherwise promote 'the interest of justice.'"  *Id.* at 581 (quoting 28 U.S.C. § 1404(a)).  However, because the § 1404(a) "calculus changes" when a valid forum-selection clause exits between the parties, *id.,* the Court must first determine whether the forum-selection clause in the CSA applies in this action, even though Plaintiff has not alleged a claim for breach of the CSA. [2]

---

[2]    The CSA is properly before the Court.  Pursuant to Fed. R. Civ. Proc. 10(c), a "copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  The CSA (Doc. # 7-2) was attached to Plaintiff's Amended Complaint as an exhibit, and thus is a part of the record for the Court's consideration.

**A.      The CSA's Forum-Selection Clause**

In a "diversity suit, the enforceability of the forum selection clause is governed by federal law." *Wong v. PartyGaming, LTD*, 589 F.3d 821, 828 (6th Cir. 2009).  However, the question of which law governs the interpretation of the forum-selection clause is less clear.  *See O&G Energy, LLC v. Rimkus Consulting Grp.*, LLC, No. 7:11-cv-147-ART, 2011 WL 6153194, at *2 (E.D. Ky. Dec. 12, 2011).  "As a federal court sitting in diversity, [the Court must] apply the choice-of-law provisions of the forum state." *NILAC Int'l Mktg. Grp. v. Ameritech Servs., Inc.*, 362 F.3d 354, 358 (6th Cir. 2004) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  In Kentucky, the law governing a contract dispute is that of the state with "the most significant relationship to the transaction and the parties." *Pedicini v. Life Ins. Co. of Ala.*, 682 F.3d 522, 526 (6th Cir. 2012) (quoting *State Farm Mut. Auto. Ins. Co. v. Marley*, 151 S.W. 3d 22, 42 (Ky. 2004)).

The parties have agreed that "[the CSA] shall be interpreted and enforced in accordance with the laws of California without regard to the conflict of law provisions thereof."  (Doc. # 7-2 at 10).  However, "Kentucky courts will not automatically honor a choice-of-law provision, to the exclusion of all other considerations." *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 393 (6th Cir. 2000); s*ee also Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983) ("Kentucky courts have apparently applied substantive law *whenever possible* … [I]t is apparent that Kentucky applies its own law unless there are overwhelming interests to the contrary.") (Emphasis in original); see also *Schnuerle v. Insight Communications Co., L.P.*, 376 S.W3d 561, 567 (Ky. 2012)(holding that Kentucky law governed despite the existence of a choice-of-law provision that

required New York law governed, because Kentucky has "the greater interest and the most significant relationship to the transaction and the parties.").

Plaintiff argues that its primary office is in Kentucky, the proprietary software that "is the primary basis for [Plaintiff's] claims" was developed in Kentucky, and a substantial amount of communication between Defendants' and Plaintiff's employees and executives took place to, from, and at Plaintiff's office in Kentucky. (Doc. # 26 at 1-4). Defendant argues, on the other hand, that none of the parties reside in Kentucky, but that Plaintiff's members reside in North Carolina, Defendant Pacific Sky's members reside in California, and Turvo is incorporated in Delaware with a principle place of business in California. (Doc. # 20-1 at 6). Defendant also argues that the choice-of-law provision in the CSA should prevail, making California law the applicable law in this dispute. (Doc. # 29 at 8-10). The Court notes that Plaintiff alleges its corporate offices are in North Carolina it its Amended Complaint. (Doc. # 7 at 16). The CSA states as much—that MegaCorp is an limited-liability company with offices in North Carolina, and that Defendant Pacific Sky is a Nevada limited-liability company with offices in California. (Doc. 7-2 at 1). And the services for the First Statement of Work, included as part of the CSA, were to be "performed in Palo Alto, CA." *Id.* at 13.

The Court finds that Kentucky does not have the greater interest or most significant relationship to the CSA and the parties to the CSA. None of the parties are incorporated in Kentucky. None of the parties have members who reside in Kentucky. None of the parties have headquarters in Kentucky. The CSA states that the services under the agreement are to be performed in California. The state with the most significant relationship to the transaction is California, the same state that the parties agreed to in

their choice-of-law provision. Therefore, California law governs the interpretation of the CSA. *See Aldridge Electric, Inc. v. Am. Mun. Power, Inc.*, No. 5:16-cv-163-GNS, 2017 WL 986682, at *4 (W.D. Ky. March 14, 2017) ("[T]he gravamen of the case is a contract dispute between two diverse parties that are not citizens of Kentucky, which agreed to a choice-of-law clause stipulating the application of Ohio law. This situation hardly reflects a strong localized interest ….").

### 1. The Forum-Selection Clause must be Narrowly Construed.

Under California law, if "contractual language is clear and explicit, it governs." *Bank of the W. v. Superior Ct.*, 833 P.2d 545, 552 (Cal. 1992). However, where the language is not clear, the court "must interpret [assertedly ambiguous] language in context, with regard to its intended function." *Id.* Crucially, "language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Id.* (citing *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 718 P.2d 920, n.7 (Cal. 1986).

Thus, the Court must determine whether this contractual language in the CSA is clear and explicit:

> The parties agree to the exclusive jurisdiction of the state and federal courts located in, or having jurisdiction over, Santa Clara County, California.

The Court finds that this language is neither clear nor explicit. Instead, it is ambiguous, as it "is capable of more than one result" and may "lead to absurd results." *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 132 Cal. Rptr. 2d 151, 158 (Cal. Ct. App., 2003). Specifically, the scope of the forum-selection clause—namely, what actions it apples to—is ambiguous. The clause could be interpreted a variety of ways. One interpretation would suggest that the parties intended to be bound to the named

courts for the litigation of all matters, whether between the parties or not, and for perpetuity.  But that result is absurd.  Another interpretation would suggest that the parties intended to be bound to the named courts for all matters in all disputes arising out of or related to the CSA.[3]  Still another interpretation would suggest that the parties intended the forum-selection clause to involve govern only disputes directly involving the CSA.  The plain terms of the CSA's forum-selection clause are ambiguous.

Normally, ambiguity in a contract is construed against the drafter. *Hunt v. Superior Ct.*, 97 Cal. Rptr. 2d 215, 220 (Cal. Ct. App. 2000) (citing *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*,817 F.2d 75, 77–78 (9th Cir. 1987)).  However, there is no clear indication of which party drafted the CSA.  As a result, it falls to the court "to determine the ultimate construction to be placed on the ambiguous language by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties." *R.J. Reynolds Tobacco*, 132 Cal. Rptr. 2d at 158.

Considering the forum-selection clause in its context, the Court notes that it falls within the same paragraph, and is directly preceded by, the choice-of-law provision.  (Doc. # 7-2 at 10).  In fact, these two provision make up the entirety of Paragraph 13.10 of the CSA.  *Id.*  And the choice-of-law clause is clear in its scope; it is limited to the CSA. ("This Agreement shall be interpreted and enforced with the laws of California.").  *Id.*  Contract-interpretation principles guide this Court to adopt a similar construction and limitation for the forum-selection clause, making the narrowest interpretation—that the CSA's forum-selection clause applies only to disputes directly involving the CSA—the most reasonable.

---

[3]    Often, the parties clearly indicate such a broad intention through the language of the provision. *See, e.g., Smith, Valentino & Smith,* 551 P.2d 1206, 1210 (Cal. 1976) ("Any actions or proceedings instituted by . . . (Smith) under this Agreement with respect to any matters arising under OR growing out of this agreement…").

*See, e.g., Park Plaza II, Ltd. v. Am. Bankers Ins. Co.*, No. G048916, 2014 WL 5500659, at *5 (Cal. Ct. App. Oct. 31, 2014) ("By placing the forum selection provision at the end of a lengthy paragraph describing the parties' rights to examine one another's records, we conclude the parties intended the provision to apply only to lawsuits involving the parties' examination of records.").

### 2. The forum-selection clause is valid and enforceable.

Having concluded that the forum-selection clause in the CSA must be read narrowly to apply to the CSA only, the Court must decide whether the provision applies to the claims in this action nonetheless. As a threshold matter, the Court must determine whether the clause is enforceable. *Wong*, 589 F.3d at 828 (citing *Sec. Watch, Inc. v. Sentinel Sys., Inc.,* 176 F.3d 369, 375 (6th Cir. 1999)). As the party opposing the forum-selection clause, Plaintiff has the burden of showing it should not be enforced, which Plaintiff has failed to do. (Doc. # 26).

Moreover, other courts within this Circuit have found forum-selection clauses that are equally vague and ambiguous to be valid and enforceable. For example, in *Total Quality Logistics v. Cavendish Farms, Inc.*, No. 1:o9-cv-221-SJD, 2010 WL 348316 (S.D. Ohio Jan. 26, 2010), the plaintiff alleged seven claims in its Amended Complaint, including breach of a service agreement. The plaintiff did not attach a copy of this agreement with the complaint, but the defendant included a copy with its answer. *Id.* at *2. Incorporated into this agreement was a "Terms and Conditions" section, which included the ambiguous clause that follows: "The Agreement is to be governed, both with respect to its construction and performance, by the laws of the state or province of the Irving corporation set forth in the Supply agreement and the parties agree to submit to the

exclusive jurisdiction of the courts of such state or province." *Id.* On Defendant's motion, the court had little difficulty determining that "the forum selection clause [was] enforceable and that the Southern District of Ohio [was] not the proper venue for TQL's suit against Cavendish." *Id.* at *4. And in *Keehan Tenn. Invs., LLC, v. Guardian Capital Advisors, Inc.*, No. 1:14-cv-994-DCN, 2014 WL 4809448 (N.D. Ohio Sept. 26, 2014), the court found a forum-selection clause to be valid and enforceable when it stated only: "*Exclusive Jurisdiction.* The parties acknowledge and consent to the exclusive jurisdiction of any competent court in Reno, Nevada." *Id.* at *1 (Emphasis in original).

**B.    Scope of the Forum-Selection Clause.**

The Court, having found the forum-selection clause in the CSA to be valid and enforceable despite its ambiguity, the Court must now determine whether it applies to any of the alleged claims.

**1.    *Plaintiff's Contract Claims.***

The Court looks first to the breach-of-contract claims in the Amended Complaint. As indicated *supra*, the law governing a contract dispute is that of the state with "the most significant relationship to the transaction and the parties." *Pedicini*, 682 F.3d at 526.

**a.    Breach of the NDA.**

Much like the CSA, the parties to the NDA are Defendant Pacific Sky, a Nevada limited-liability company with a principal office in California, and Plaintiff, a limited-liability company located in North Carolina. (Doc. # 7-1). The NDA specifies that it "shall be governed by and construed in accordance with the laws of California without reference to conflict of laws principles." *Id.* And according to the Amended Complaint, the NDA was signed when Pacific Sky founder Mr. Gilmore "traveled to North Carolina to meet with Mr.

Legg and MegaCorp's Vice President, Bob Klare." (Doc. # 7 at 7-8). Given the parties' intention that the NDA—and with it, the parties' exchange of information—be governed by California law, and that at least one of the parties had a principal office in California, the Court finds that California is the state with "the greater interest and the most significant relationship to the transaction and the parties," *Schnuerle*, 376 S.W3d at 567, and so interpretation of the NDA is governed by California law.

Plaintiff's allegations of breach of the NDA do not involve of the CSA. The NDA was executed before the CSA. (Doc. # 7 at 10) ("In addition to the NDA and to further define the business relationship, the services to be performed and to ensure that all confidential and propriety information exchanged between the parties was protected from disclosure to third-parties, the parties executed [the CSA]."). The CSA does not incorporate the NDA, nor does the NDA anticipate the CSA. Instead both documents have clear merger clauses, indicating that the "terms and conditions of [the] Agreement contain the entire understanding and agreement of the parties regarding the subject matter hereof," (Doc. # 7-2 at 8),[4] and that "[t]his Agreement sets forth the entire agreement between the parties." (Doc. # 7-1). Neither the NDA nor the CSA can be construed to inform, or require anything of, the other. *See Malmstrom v. Kaiser Aluminum & Chem. Corp.*, 231 Cal. Rptr. 820 (Cal. Ct. App. 1986) (enforcing a contract with a merger clause as against any other possible implied contract). The forum-selection clause in the CSA does not bind the parties with respect to the NDA. Put another way, the CSA's forum-selection clause does not require an action for breach of the NDA to be

---

[4] In fact, because portions of the CSA cover the same subject matter as the NDA, and because the language in the CSA's merger clauses indicates that the CSA "supersedes all existing agreements," it might be argued that upon execution, the CSA superseded the NDA. Neither party has made such an argument, and so the Court declines to address this issue in its analysis of the instant Motion.

brought in California.

### b. Breach of the LOU.

Although the LOU does not contain a choice-of-law provision, the Court finds that California has the greatest interest and most significant relationship to the transaction and parties. Therefore, California law governs.

In contrast to the NDA, the LOU contains no merger clause. Importantly, the Court notes that the LOU exists entirely within the context of the CSA. In Plaintiff's words, following the signing of the CSA, "[g]iven the nature of the business relationship and information to be exchanged … the parties were not finished defining the scope of the protections given to that information." (Doc. # 7 at 12). "Because Pacific Sky requested carte blanche access to MegaCorp's systems … the parties also executed [the LOU]." *Id.* And the LOU states that the TMS and TMS code are "utilized in discovery and analysis for the purpose of finalizing the [CSA, and] … specified in the scope of work provided to Pacific Sky as part of the [CSA]." (Doc. # 7-3). Thus, the LOU was created as a result of the CSA, to give additional protection to Plaintiff against disclosure and misappropriation of information to be exchanged under the CSA.

The LOU was entered into to "finish[ ] defining the scope of the protections given to [the] information" that was to be exchanged under the CSA. (Doc. # 7 at 12). As such, given that the LOU was drafted to add specific protections to a portion of the information to be shared pursuant to the CSA, and is in writing and signed by MegaCorp's founder and Pacific Sky's president, the Court finds that the LOU is an amendment to the CSA. (Doc. # 7-2 at 9) ("This Agreement … cannot be amended unless in writing and signed by duly authorized representatives of each party."). As an amendment to the CSA, the

Court finds that the CSA and the LOU should be read together, and thus, despite the absence of a forum-selection clause in the LOU, the CSA's forum-selection clause—even narrowly construed—encompasses and governs actions alleging breach of the LOU.  *See Smith, Valentino & Smith, Inc. v. Superior Ct.*, 131 Cal. Rptr. 374, 377 (Cal. 1976) (holding that "forum selection clauses are valid and may be given effect, in the court's discretion and in the absence of a showing that enforcement of such a clause would be unreasonable.")  *Smith, Valentino & Smith, Inc. v. Superior Ct.*, 131 Cal. Rptr. 374, 377(Cal. 1976).  Accordingly, the Court finds that Plaintiff's claim for breach of the LOU must be brought in California.

### c.    Unjust Enrichment.

In Kentucky, unjust enrichment falls within the ambit of "quasi-contracts," and so the Court will use the "most significant relationship to the transaction and the parties" standard to determine the choice of law for this action.  *See Kentucky Ass'n of Ctys. All Lines Fund Tr. v. McClendon*, 157 S.W.3d 626, 632-33 (Ky. 2005) ("A 'quasi-contract,' also termed an 'implied-in-law contract,' is 'an obligation imposed by law because of the conduct of the parties, or some special relationship between them, or because one of them would otherwise be unjustly enriched.'") (quoting *Implied-in-Law Contract*, Black's Law Dictionary (7th ed. 1999).

For this claim too, under the "most significant relationship" analysis, the Court finds that the state of California has the most significant relationship to the parties and to the transaction.  The claimed benefit was allegedly conferred upon a business operating out of California, the alleged appreciation of the benefit would be where the business operates, and the alleged retention without payment would be in California, at the place

of business.  However, like the NDA, there is no evidence to support an argument that the forum-selection clause in the CSA was intended to bind the parties in a then-inchoate unjust-enrichment allegation.  The Court finds that the forum-selection clause in the CSA is not applicable to this claim.

### 2. *Plaintiff's Tort Claims.*

Looking now to Plaintiff's tort claims, the Court must determine whether the forum-selection clause in the CSA is applicable to any of the following claims: violation of KUTSA,[5] tortious interference with business relationships, or negligent misrepresentation.  Kentucky's approach to choice-of-law for torts varies from its approach to contracts; in tort claims, Kentucky law applies "if there are significant contacts—not necessarily the most significant contacts—with Kentucky." *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky, 2009) (citing *Foster v. Leggett,* 484 S.W.2d 827, 829 (Ky. 1972)).

The Court finds that there are significant contacts with Kentucky for each of the alleged tort claims. According to Plaintiff, its TMS and TMS Source code are the pieces of information at the heart of its claims, and the sales department, information-technology department, and the TMS itself are located in Covington, Kentucky.  (Doc. # 26 at 2-3). The KUTSA claim alleges misappropriation of trade secrets related to the TMS Source Code, commission and fee rates, sales figures, and "customer relationships and productivity of its sales employees," (Doc. # 7 at 23), all of which would fall within the scope of the information and divisions managed at Plaintiff's Covington, Kentucky office.

---

[5] The Court analyzes the KUTSA claim as a tort, because KUTSA sounds more in tort than in contract, and when enacted, KUTSA replaced existing "conflicting tort" laws in Kentucky, but did not affect contractual remedies.  Ky. Rev. Stat. Ann. § 365.892.

So too does the claim for intentional interference with a business relationship. "Undermining [Plaintiff's] ability to compete in the marketplace," *id.* at 24, would necessarily significantly impact the "customer relationships" and sales employee productivity of the sales team, which Plaintiff alleges was placed in Covington, Kentucky. (Doc. # 26 at 2). And the claim for negligent misrepresentation alleges that the Defendants "intend[ed] to obtain and use [Plaintiff's] confidential and proprietary information for its own benefit." (Doc. # 7 at 26). As the physical situs where the TMS Source Code, among other sets of information, was stored, significant contacts related to these torts existed in Kentucky. Therefore, Kentucky law governs these tort claims.

Under Kentucky law, where no public interest is implicated, tort claims can be bound by a forum-selection clause found in the contract giving rise to the relationship between the parties. *Ky.Farm Bureau Mut. Ins. Cos. v. Henshaw*, 95 S.W.3d 866, 867-68 (Ky. 2003):

> Although [the] claim was brought under the Kentucky Civil Rights Act … the relationship between the parties was of a consensual origin. Without the contract, which defined the parties' rights and liabilities, there would have been no relationship and no basis upon which to claim an age-based civil rights violation. As the contract established the relationship between the parties, and as there is a probability that it will influence any subsequent litigation, enforcement of the choice-of venue clause is not unreasonable.

Under this law, the Court might be tempted to find that, because the tort claims in this case would not have existed but for the relationship established through the CSA, these claims should also be bound by the CSA's forum-selection.

However, the facts and context of *Henshaw* require otherwise. The forum-selection clause in *Henshaw* was broader than the forum-selection clause at issue here. In *Henshaw,* the parties agreed that "any action brought against the other relating to or

arising out of this Agreement shall be brought in a state or federal court of general jurisdiction in Jefferson County, Kentucky…" *Id.* at 866, n.1. Although the Supreme Court of Kentucky did not address the scope of the forum-selection clause directly, the Court declines to expand the scope of narrowly-drawn forum-selection clauses under Kentucky law. *Id.* at 866 (("The issue… is whether our routine practice of enforcing forum selection clauses should be followed in this venue selection case or whether the civil rights nature of the claim invalidates the contract provision that determines venue."). The Court therefore finds that the forum-selection clause in the CSA is not applicable to Plaintiff's tort claims.

### C.     The Court's § 1404(a) analysis.

Having determined that one of Plaintiff's six claims is subject to the CSA's forum-selection clause, [6] the Court must return to its § 1404(a) analysis and determine whether to transfer this action to the Northern District of California.

Under 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." There being no dispute as to whether this action could have been brought in a county or federal court having jurisdiction over Santa Clara County, California,[7] the Court must consider both private and public interests in evaluating the "convenience of the parties" and the "interest of justice." *Atl. Marine Constr. Co.*, 134 S.

---

[6]     Because the CSA's forum-selection clause determines the "exclusive jurisdiction," the provision must be considered a mandatory, not a permissive, forum-selection clause.

[7]     Defendant Pacific Sky has a principal place of business in Palo Alto, California. The Court takes judicial notice that Palo Alto is in Santa Clara County, satisfying venue under 28 U.S.C. 1391(b) if this case were brought in Santa Clara County.

Ct. at 581. The Court must also "give some weight to [Plaintiff's] choice of forum." *Id.* Private interest factors include: "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* at 581, n.6 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, n.6 (1981)). And the public interest factors include the following: "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.*

At the outset, the Court recognizes that the LOU claim is not like the others. In determining whether to transfer a case, "[t]he presence of a forum-selection clause … will be a significant factor that figures centrally in the district court's calculus." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). In fact, where a valid forum-selection clause exists between the parties, the § 1404(a) "calculus changes." *Atl. Marine Constr. Co.*, 134 S. Ct. at 581. The plaintiff's traditional role as master of the complaint is abandoned, the parties' private interests are ignored, and the choice-of-law of the transferring court does not transfer to the transferee court. *Id.* at 581-82. "A valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Id.* at 581 (quoting *Stewart*, 487 U.S. at 33). However, because the forum-selection clause applies to only one claim, an examination of the private interests of the other claims remains necessary.

### 1.    *The Private Interests.*

The Court finds that the private interests discussed in *Atlantic Marine* weigh in favor of transfer.  It is undisputed that the TMS, the TMS Source Code, and other information that may be confidential or proprietary under either the NDA or the CSA were transferred from Plaintiff to Defendants.  And according to Plaintiff, this information was developed and stored or managed out of Covington, Kentucky. (Doc. # 26 at 1-3).  But the proof of Plaintiff's claims does not sit in Covington, Kentucky.  Each of Plaintiff's other claims requires inquiry into Defendants' actions, Defendants' correspondence with third-parties, Defendants' misappropriation of information falling within the ambit of KUTSA, Defendants' contracting with third-parties, the unjust enrichment of Defendant, and correspondence that might implicate Defendants' alleged misrepresentation.  This evidence will be more easily accessed at Defendants' principal place(s) of business in California than in Covington, Kentucky.

Given that proof of Plaintiff's claims will require inquiry into Defendants' businesses, including the members, leaders, and employees of the businesses, the Northern District of California is also a better forum than this District to provide process for unwilling witnesses and to reduce the cost of obtaining attendance of willing witnesses. Although Plaintiff argues that "the vast majority of [Plaintiff's] employees involved [in] the underlying facts of this dispute are located in Covington, Kentucky, including … the primary architect of the Source Code and the TMS," Plaintiff offers no explanation as to how these witnesses will help to prove its claims against Defendant, when the actual transfer of information under the CSA is not in dispute.  (Doc. # 26 at 12).

## 2. *The Public Interests.*

The Court finds that the local interest in this District is not greater than it would be where either Plaintiff or Defendants reside. Although the bulk of Plaintiff's operations are alleged to take place in this District, (Doc. # 26 at 1-2), Plaintiff itself is a limited-liability company whose members reside in North Carolina, and Defendants operate out of California. (Doc. # 7 at 2). No District appears to have any more interest than the others. Although Plaintiff argues that Kentucky is the center of its business operations and the "location where the Source Code and TMS was developed and maintained," (Doc. # 26 at 11), Plaintiff also argues that its corporate offices were in Wilmington, North Carolina, and that Turvo employees had logged into Plaintiff's "production system from a remote terminal server." (Doc. # 7 at 16). In sum, no District sits perfectly atop the bulk of the injuries or operative facts giving rise to this suit. Thus, the "local interest" inquiry weighs neutrally in the § 1404(a) analysis.

The court finds that the inquiry into consideration of the administrative difficulties that result from court congestion also weighs neutrally. This District is twenty-sixth among the districts with its median time of 24.9 months from filing to trial for civil cases, and the Northern District of California is twenty-fifth with a median time of 24.8 months from filing to trial for civil cases.[8]

The third public interest—which court will be most at home with the law—varies by claim, but in the balance, weighs towards transfer. Because it is an amendment to the

---

[8] The Court considers the data provided by the United States Courts website, found at: http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2017.pdf (last visited Feb. 20, 2018). The Court has reviewed the December 31, 2017 version of this report and—noting that it does not include data for the Eastern District of Kentucky for median time from filing to trial—relied the September 30, 2017 version, as it provides a fuller data set.

CSA, the LOU will be bound by the California law, making the Northern District of California more "at home with the law" than this District. (Docs. # 7-1 and 7-2 at 10). As discussed above, California law will also be applied to the claims for breach of the NDA and unjust enrichment, making California more at home with the law. In addition, although the KUTSA claim alleges violation of a Kentucky statute, California has also adopted a Uniform Trade Secrets Act with identical definitions of trade secrets. *Compare* Ky. Rev. Stat. Ann. § 365.880 *with* Cal. Civ. Code § 3426.1. Both courts should be equally at home with the law for this claim. The same can be said of the two remaining torts, for negligent misrepresentation and tortious interference with a business relationship.[9] Therefore, the public interest weighs in favor of transfer.

Considering both the private and public factors, the Court finds that the balance tends towards transfer. Looking at the LOU, the forum-selection clause must be enforced unless Plaintiff can "clearly show that enforcement would be unreasonable and unjust." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). Because both the public and private interest factors in this action lean towards transfer, this action will be transferred to the Northern District of California.

## III.  CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows;

(1)    Defendants' Motion to Transfer Venue under 28 U.S.C. § 1404(a) (Doc. # 20) is **granted**; and

(2)    This matter is hereby **transferred** to the Northern District of California.

---

[9]     Although the Court found that Kentucky substantive law would apply to those claims, that conclusion was the result of this court's status as a federal court sitting in diversity and applying Kentucky choice-of-law rules. Accordingly, Kentucky law would not necessarily apply if this action were transferred.

This 22nd day of February, 2018.



Signed By:

*David L. Bunning*

United States District Judge

K:\DATA\Opinions\Covington\2017\17-109 Megacorp v Turvo MOO re DE 20.docx